IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERTA MCCONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-285-SMD |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Commissioner of Social Security*,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION & ORDER</u>

On June 6, 2017, Plaintiff Roberta McConnell ("McConnell") filed for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. She alleged disability onset beginning March 1, 2012, and later amended that date to February 26, 2016. McConnell's application was denied at the initial administrative level. McConnell then requested and received a hearing before an Administrative Law Judge ("ALJ"), wherein she received an unfavorable decision denying her benefits. The Appeals Council denied McConnell's request for review of the ALJ's decision, which consequently became the final decision of the Commissioner of the Social Security Administration ("the Commissioner"). *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). McConnell now appeals the Commissioner's decision under 42 U.S.C. § 405(g).[2] For the reasons that

---

[1] Kilolo Kijakazi, the acting Commissioner of the Social Security Administration, is substituted for Andrew Saul as Defendant in his official capacity in this action under Federal Rule of Civil Procedure 25(d)(1).

[2] Under 28 U.S.C. § 636(c), the parties have consented to the undersigned Chief United States Magistrate Judge conducting all proceedings and entering final judgment in this appeal. *Pl.'s Consent* (Doc. 9); *Def.'s Consent* (Doc. 10).

follow, the undersigned AFFIRMS the Commissioner's decision.

## I. STATUTORY FRAMEWORK

The Social Security Act establishes the framework for determining who is eligible to receive Social Security benefits. *Martin v. Sullivan*, 894 F.2d 1520, 1530 (11th Cir. 1990). In making a benefits determination, an ALJ employs a five-step process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or medically equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a); 20 C.F.R § 416.920(a)(4). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of not disabled." *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3] A claimant bears the burden of proof through step four. *See Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996). The burden shifts to the Commissioner at step five. *Id.*

To perform the fourth and fifth steps, the ALJ must first determine the claimant's Residual Functional Capacity ("RFC"). *Phillips v. Barnhart*, 357 F.3d 1232, 1238-39 (11th Cir. 2004). A claimant's RFC is what the claimant can still do—despite his impairments—based on the relevant evidence within the record. *Id.* The RFC may contain both exertional

---

[3] *McDaniel* is a SSI case. SSI cases arising under Title XVI of the Social Security Act are appropriately cited as authority in Title II cases, and vice versa. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 875 n.* (11th Cir. 2012) (per curiam) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

and non-exertional limitations. *Id.* at 1242-43. Considering the claimant's RFC, the ALJ determines, at step four, whether the claimant can return to past relevant work. *Id.* at 1238. If a claimant cannot return to past work, the ALJ considers, at step five, the claimant's RFC, age, education, and work experience to determine if there are a significant number of jobs available in the national economy the claimant can perform. *Id.* at 1239. To determine if a claimant can adjust to other work, the ALJ may rely on (1) the Medical Vocational Guidelines[4] or (2) the testimony of a vocational expert ("VE").[5] *Id.* at 1239-40.

## II.     STANDARD OF REVIEW

A federal court's review of the Commissioner's decision is limited. A court will affirm the Commissioner's decision if the factual findings are supported by substantial evidence and the correct legal standards were applied. *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999) (citing *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997)). A court may reverse the Commissioner's final decision when it is not supported by substantial evidence or the proper legal standards were not applied in the administrative proceedings. *Carnes v. Sullivan*, 936 F. 2d 1215, 1218 (11th Cir. 1991).[6]

---

[4] Grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. *See* 20 C.F.R. pt. 404 subpt. P, app. 2. Each factor can independently limit the number of jobs realistically available to an individual. *Phillips*, 357 F.3d at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

[5] A vocational expert is an "expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." *Phillips*, 357 F.3d at 1240.

[6] A court is required to give deference to factual findings, with close scrutiny to questions of law. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145 (11th Cir. 1991).

"Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Despite the limited nature of review, a court must scrutinize the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). However, a court may not decide the facts anew or substitute its judgment for that of the Commissioner. *Cornelius*, 936 F. 2d at 1145.

## III.   ADMINISTRATIVE PROCEEDINGS

McConnell was 52 years old on her alleged onset date and 54 years on the date she was last insured. Tr. 75. She has a high school education and previously worked as a manager of a financial institution and as a pharmacy technician. Tr. 26-27, 42-45 66-69, 167. She alleged disability due to severe gout, arthritis, fibromyalgia, osteostenosis, and irritable bowel syndrome. Tr. 166.

In the administrative proceedings before the Commissioner, the ALJ made the following findings with respect to the five-step evaluation process for McConnell's disability determination. At step one, the ALJ found that McConnell has not engaged in substantial gainful activity from February 26, 2016—the amended alleged onset date—through December 31, 2017—the date she was last insured. Tr. 18. At step two, the ALJ found that McConnell suffers from the following severe impairments: "degenerative disc disease of the cervical spine, mild osteoarthritis of the bilateral upper extremities,

4

connective tissue disease, hypertension, and obesity[.]" Tr. 18. At step three, the ALJ found that, through the date last insured, McConnell "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" Tr. 20.

> The ALJ proceeded to determine McConnell's RFC, articulating it as follows:
>
> [T]he claimant has the residual functional capacity to perform light work . . . except the claimant could occasionally climb ramps and stairs. The claimant could never climb ladders, ropes, or scaffolds. The claimant could occasionally balance, stoop, kneel, crouch, and crawl. The claimant could frequently reach above the shoulder with the bilateral upper extremities. The claimant could frequently handle, finger, and feel with the bilateral upper extremities.

Tr. 21. At step four, the ALJ determined that McConnell, through the date last insured, "was capable of performing past relevant work as a Financial Institution Manager[.]" Tr. 26. At step five, the ALJ concluded that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." Tr. 22. Based on the testimony of a VE, the ALJ found that McConnell could perform other jobs existing in the national economy, including "Cashier II," "Marker," and "Sales Attendant." Tr. 27-28. Accordingly, the ALJ determined that McConnell was not under a disability at any time from February 26, 2016, through December 31, 2017. Tr. 23.

## IV.   ISSUES PRESENTED

McConnell argues that the Commissioner's decision should be reversed for two reasons. First, McConnell contends that the ALJ erred by not finding her fibromyalgia to

be a medically determinable impairment.[7] *McConnell's Brief* (Doc. 14) pp. 2-8. Second, McConnell contends that the ALJ failed to properly evaluate her subjective symptoms. *Id.* at 8-13. As explained below, McConnell's arguments fail.

## V.    ANALYSIS

### 1. Substantial evidence supports the ALJ's determination that McConnell's fibromyalgia was not a medically determinable impairment.

McConnell argues that the ALJ erred when she found that her fibromyalgia was not a medically determinable impairment ("MDI") under Social Security Ruling ("SSR") 12-2p. *Id.* at 6. McConnell asserts that this error was not harmless because the ALJ did not consider the combined impact of her severe and non-severe impairments on her functional capacity. *Id.* at 7.

SSR 12-2p provides "guidance on how the [Social Security Administration] develops evidence that a person has a medically determinable impairment of fibromyalgia and how it evaluates fibromyalgia in disability claims." *Sorter v. Comm'r of Soc. Sec.*, 773 F. App'x 1070, 1073 (11th Cir. 2019). SSR 12-2p "sets out a two-step process for evaluating symptoms, which involves (1) determining whether medical signs and findings show that the person has a medically determinable impairment, and (2) once a medically determinable impairment is established, evaluating the 'intensity and persistence of the

---

[7] Although McConnell styles the issue as the ALJ's failure to find her fibromyalgia severe, the substance of her argument is that the ALJ erred in finding that her fibromyalgia was not a medically determinable impairment. *See McConnell's Brief* (Doc. 14) pp. 2-8. Because the ALJ found that McConnell's fibromyalgia was not a medically determinable impairment, Tr. 20, the ALJ never determined whether it was severe or non-severe. Thus, the ALJ erred, if at all, when finding that McConnell's fibromyalgia was not a medically determinable impairment.

person's pain or any other symptoms' and determining 'the extent to which the symptoms limit the person's capacity for work.'" *Id.* (quoting SSR 12-2p).

Relevant here is the first step of the analysis, which determines whether a claimant has a MDI of fibromyalgia. SSR 12-2p requires the ALJ to "find that a person has an MDI of [fibromyalgia] if [a] physician diagnosed [fibromyalgia] *and* provides the evidence [described] in section II.A. *or* section II.B., *and* the physician's diagnosis is not inconsistent with the other evidence in the person's case record." SSR 12-2p (emphasis added). Sections II.A. and II.B. list different criteria for diagnosing fibromyalgia. Specifically, Section II.A. sets forth the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, while Section II.B. provides the 2010 ACR Preliminary Diagnostic Criteria. *Id.* The 1990 ACR criteria requires that a claimant demonstrate: "(1) a history of widespread pain"; "(2) at least 11 positive tender points on physical examination"; and "(3) evidence that other disorders which could cause the symptoms or signs were excluded." *Id.* The 2010 ACR criteria requires that a claimant show: "(1) a history of widespread pain"; "(2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions";[8] and "(3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded." *Id.*

---

[8] In footnotes 9 and 10, SSR 12-2p lists, *inter alia*, the following somatic symptoms and co-occuring conditions of fibromyalgia: muscle pain, irritable bowel syndrome, fatigue or tiredness, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, hives, vomiting, diarrhea, heartburn, seizures, hair loss, frequent urination, anxiety disorder, chronic fatigue syndrome, gastroesophageal reflux disorder, and migraine. SSR 12-2p.

Here, the ALJ found that McConnell's fibromyalgia was not a MDI. Tr. 20. In so doing, the ALJ examined McConnell's evidence, as required, under Sections II.A. and II.B. The ALJ acknowledged that, under both Sections, McConnell satisfied the first prongs—i.e., that a physician diagnosed her with fibromyalgia.[9] Tr. 20. Similarly, the ALJ concluded that the third prongs were satisfied because other conditions that could cause her symptoms were excluded.[10] However, the ALJ found that McConnell's medical records failed to satisfy the second prongs of either test. Tr. 20. Specifically, she noted that "the consultative examiner noted no trigger points on [McConnell's] physical examination." Tr. 20. And, the ALJ concluded that McConnell's "medical records do not show repeated manifestations of at least six or more of the fibromyalgia symptoms, signs, or co-occurring conditions" listed in SSR 12-2p. Tr. 20. As such, the ALJ determined that McConnell's fibromyalgia did not meet the requirements under SSR 12-2p and, therefore, was not a MDI. Tr. 20.

McConnell challenges the ALJ's finding under Section II.B. that she did not show repeated manifestations of fibromyalgia symptoms, signs, or co-occurring conditions.[11] *McConnell's Brief* (Doc. 14) p. 6. She asserts that her medical records show evidence of

---

[9] The ALJ noted that McConnell's primary care provider diagnosed fibromyositis in 2014 and that the consultative examiner diagnosed fibromyalgia. Tr. 20.

[10] The ALJ noted that "[t]he record shows testing that has been performed to exclude other causes" and points to two occasions on which McConnell received an MRI of her spine and an x-ray of her hand. Tr. 20.

[11] McConnell does not argue that the ALJ erred in finding, under Section II.A., that she did not show evidence of trigger points. *See McConnell's Brief* (Doc. 14) pp. 2-8. The undersigned has reviewed McConnell's medical records and has not located evidence indicating that the ALJ erred in this determination.

"fatigue/tiredness, weakness, headaches, numbness, fever, and heartburn (Tr. 61-62, 298, 342-343, 375, 379, and 395-396)." *Id.* at 6-7. She cites the following evidence in support of her argument. At the hearing before the ALJ, McConnell reported headaches accompanied by pain in her neck. Tr. 61-62. On February 29, 2016, McConnell reported to a treating physician that she had "numbness tingling left hand[,] fingers[,] and thumb." Tr. 298. She also reported "some weakness in the left arm" and "frequent or severe headaches." Tr. 298. On December 29, 2016, during a visit to her primary care physician, she reported fatigue and weakness. Tr. 396. On September 25, 2017, McConnell visited her primary care physician and again reported fatigue and weakness. Tr. 379. On November 20, 2017, McConnell complained of fever, fatigue, chills, and weakness, and was diagnosed with acute bronchitis. Tr. 375-77. Throughout her medical records, McConnell complained of heartburn. *See, e.g.*, Tr. 268, 272, 319, 374.[12]

Substantial evidence supports the ALJ's determination that McConnell did not present sufficient evidence to show that she had six or more recurring signs, symptoms, or co-occurring conditions of fibromyalgia. McConnell has experienced some of the signs and symptoms of fibromyalgia; however, she has not shown that at least six of them were recurring as required under Section II.B. Of course, the undersigned is mindful that fibromyalgia symptoms may wax and wane. *Laurey v. Comm'r of Soc. Sec.*, 632 F. App'x 978, 987 (11th Cir. 2015) (noting that symptoms of fibromyalgia "can wax and wane so

---

[12] McConnell does not point the Court to any specific records showing she complained of heartburn. However, the undersigned notes the records listed indicate that McConnell presented with gastrointestinal reflux, commonly known as heartburn.

that a person may have bad days and good days") (internal citations omitted). As such, McConnell is not required to present with the particular signs and symptoms during every medical visit. *See Smith v. Colvin*, 2016 WL 5956160, at *4 (D. Co. Oct. 14, 2016) (noting that the Regulations do not require a claimant to show six or more signs, symptoms, or co-occurring conditions in each treatment note). However, in reviewing McConnell's medical records in their entirety—and particularly the records cited by McConnell—the undersigned does not find that the ALJ erred by determining that McConnell did not meet the criteria set forth in Section II.B.[13] As such, the undersigned finds that substantial evidence supports the ALJ's determination that McConnell's fibromyalgia was not a MDI.

### 2. Substantial evidence supports the ALJ's discount of McConnell's subjective symptoms.

A claimant can establish disability through personal testimony about pain or other symptoms. *Marksuke v. Comm'r of Soc. Sec.*, 572 F. App'x 762, 766 (11th Cir. 2014). A claimant attempting to establish disability through her own testimony of subjective symptoms must show: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the

---

[13] At best, McConnell's medical records show four recurring signs, symptoms, and co-occurring conditions of fibromyalgia, namely: fatigue, weakness, heartburn, and headache. McConnell's references to one occasion where she had fever that was accompanied by a diagnosis of bronchitis and one occasion where she complained of numbness/tingling are insufficient to show that these symptoms of fibromyalgia were recurring. *See Germony v. Comm'r of Soc. Sec.*, 2017 WL 1018501, at *4 (M.D. Fla. Mar. 16, 2017) (finding that the plaintiff's medical records did not establish repeated manifestations of stress incontinence, tinnitus, and blurred vision where she complained of these symptoms only once and they were ultimately attributable to a hysterectomy and bladder sling).

claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

If the ALJ determines that a claimant has a medically determinable impairment that could reasonably be expected to produce pain, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms to determine if they limit her capacity to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ may consider a variety of factors, including objective medical evidence, treatment history, response to medication and other treatments, sources of pain relief, and the claimant's daily activities. 20 C.F.R. § 404.1529(c)(1)-(4). If an ALJ rejects a claimant's subjective testimony regarding her symptoms, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. These reasons must "be consistent with and supported by the evidence[.]" SSR 16-3p, at *9.

McConnell testified at the hearing that she is unable to work due to pain in her neck, shoulders, arms, hands, legs, and feet. Tr. 46-47. She rated her pain as an 8/10 and described it as "[a]ll day, every day." Tr. 46-47. She claimed that she has numbness, stiffness, headaches, and difficulty concentrating due to her pain. Tr. 61-63. McConnell estimated that she can lift 10 pounds and stand or walk for 15-20 minutes. Tr. 53. She testified that she takes medication and exercises, but neither provide her with significant pain relief. Tr. 53. As for her ability to care for herself, McConnell claimed that she has

11

difficulties dressing herself and that she must sit on a stool to cook. Tr. 53-54. She indicated that she drives two or three times per week; shops one or two times a month with help from a relative; and attends church most Sundays. Tr. 45-46, 55-56. She testified that her husband helps her with household cleaning and that she lies down up to four times a day for at least 20 minutes. Tr. 55, 64.

The ALJ concluded that McConnell's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but found that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 22. The ALJ opined that "the record as a whole supports that the claimant can perform work at the light exertional level with postural and manipulative restrictions." Tr. 23. The ALJ based this opinion on McConnell's "gap in treatment between the alleged onset date and any continued care"; "conservative and routine" treatment that successfully reduced McConnell's symptoms and allowed her to increase her activities; examinations wherein McConnell exhibited normal findings with little to no tenderness; and, finally, McConnell's daily activities, including her ability to wash dishes, do laundry, cook, bake, shop, drive, perform household chores with breaks, and rarely make flower arrangements. Tr. 25.

McConnell argues that the ALJ erred in discounting her subjective symptom testimony because she improperly (1) relied on objective medical evidence that failed to consider the impact that the combination of her impairments (including fibromyalgia) had

on her functioning; (2) criticized a gap in her treatment records without asking for an explanation; and (3) relied on her daily activities to find her allegations not credible. *McConnell's Brief* (Doc. 14) pp. 8-12.

The undersigned finds that the ALJ properly discounted McConnell's testimony. As for the objective medical evidence, the ALJ noted the following. In January 2016, McConnell reported that her shoulder pain was "much improved" as a result of physical therapy and that "she is overall doing quite well." Tr. 23, 287. Her medical provider noted that her cervical radiculopathy was "much improved," and that McConnell should return "as needed." Tr. 23, 288. In February 2016, McConnell complained that her pain returned. Tr. 23, 285. At that time, she had an MRI of the cervical spine, which showed disc osteophyte complexes and uncovertebral spurring at C4-5, C5-6, and C6-7, resulting in marked multilevel neural foraminal stenosis. Tr. 23, 301. Although treatment notes suggest that "EMG and nerve conduction studies" would be performed, McConnell did not return for her follow-up visit. Tr. 23; 50-51. She reported to the ALJ that surgery had not been recommended. Tr. 60.

In December 2016, McConnell returned to her primary care physician and reported pain in her joints.[14] Tr. 23, 395. She was prescribed Plaquenil and x-rays of her upper extremities were ordered. Tr. 23, 397-98. The x-rays showed "mild osteoarthritic changes with no findings to suggest inflammatory arthropathy." Tr. 23, 315-16. In this same

---

[14] The ALJ noted that this medical visit occurred "[a] number of months" after the visit immediately preceding it, which occurred in February 2016. Tr. 23.

timeframe, McConnell reported improvement in her joint pain with Plaquenil and stated that she was able to increase her activity level. Tr. 23, 388, 392.

In June 2017, McConnell reported that her joint pain was better after taking Plaquenil, losing weight, and decreasing her sugar intake. Tr. 23, 319. She was diagnosed with connective tissue disease. Tr. 23, 321. She showed slight tenderness and decreased range of motion in the cervical spine. Tr. 24, 321. By the end of July 2017, McConnell reported shoulder, knee, and elbow pain. Tr. 24, 382. On examination, she had tenderness and reduced range of motion in the knees, elbows, hands, and wrists. Tr. 24, 382. She was prescribed amoxicillin and Ultram. Tr. 24, 342-43.

In August 2017, during a consultative examination, McConnell was in no acute distress and was ambulating normally. Tr. 24, 342-43. She denied having headaches at that time. Tr. 24, 342-43. She had limited range of motion and tenderness in the neck, back, tibial region, shoulders, and forearms, but no trigger points or tenderness in the left and right extremities. Tr. 24, 342-43. In September 2017, McConnell complained to her primary care physician of severe pain in the elbows, shoulders, hands, knees, and hips. Tr. 24, 378. She had tenderness in the elbows and shoulders bilaterally but otherwise normal examination findings. Tr. 24, 378-80. In November 2017—the last record prior to her last insured date—McConnell reported pain in her hips, hands, wrists, neck, elbows, and shoulders. Tr. 24, 374. However, she also reported to her physician that Plaquenil helped significantly. Tr. 24, 374.

McConnell specifically argues that the ALJ's reliance on this objective evidence was faulty because the ALJ "failed to consider the impact that the combination of [her] impairments had on her functioning, including fibromyalgia, which is not documented by traditional clinical or objective testing." *McConnell's Brief* (Doc. 14) p. 10. But because the ALJ properly found that McConnell's fibromyalgia was not a MDI, the ALJ was not required to determine its severity, nor was she required to consider it when assessing McConnell's RFC. *Germony*, 2017 WL 1018501, at *6; 20 C.F.R. § 404.1545(a)(2) ("[W]e will consider all of your *medically determinable impairments* of which we are aware, including your *medically determinable impairments* that are not 'severe,' . . . when we assess your [RFC].") (emphasis added). Thus, to the extent McConnell is arguing that the ALJ improperly relied on objective evidence to discount her testimony about her fibromyalgia symptoms, that argument fails because fibromyalgia was no longer part of the analysis after step 2. SSR 16-3p (step one of the two-step process for evaluating fibromyalgia requires determining "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms"); *Simpson v. Colvin*, 2015 WL 139329, at *5 (N.D. Ala. Jan. 12, 2015) (because the ALJ found the claimant's fibromyalgia was not a medically determinable impairment, "he was not required to consider it beyond Step Two").

To the extent McConnell's argument generally challenges the ALJ's discount of her symptom testimony, substantial evidence supports the conclusion that the objective medical evidence—which shows that McConnell received conservative and routine

treatment that addressed (albeit incompletely) her symptoms—was inconsistent with McConnell's subjective testimony of debilitating symptoms. *See, e.g.*, *Laurey v. Comm'r of Soc. Sec.*, 632 F. App'x 978, 988 (11th Cir. 2015) (substantial evidence, including a conservative treatment plan consisting of pain medication, muscle relaxers, and physical therapy, supported the ALJ's determination that the claimant's symptom reports were not entirely consistent with the medical record); *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1262-63 (N.D. Ala. 2014) (noting that a doctor's conservative medical treatment for a particular condition tends to negate a claim of disability). These inconsistencies included, *inter alia*, McConnell's reports of improvement of her connective tissue disease symptoms on medication, which also increased her activity level; generally unremarkable examinations wherein she exhibited no tenderness in her joints and normal movement; her testimony that surgery was not advised for her cervical spine; and her testimony that she did not return for a follow-up visit for electromyography and nerve conduction studies. Tr. 25. These records provide substantial evidence to support the ALJ's discount of McConnell's testimony based on its inconsistency with the objective medical records.[15]

Neither did the ALJ err in noting that McConnell had a treatment gap in her records. The Eleventh Circuit has made clear: "[T]he ALJ may not draw any inferences about an individual's symptoms and [her] functional effects from a failure to seek or pursue medical treatment without first considering any explanation that might explain the failure to seek

---

[15] Because the ALJ found that McConnell's fibromyalgia was not a MDI, the ALJ did not further consider fibromyalgia at this step. Thus, when the ALJ was evaluating the nature of McConnell's treatment, she determined that it was conservative as it related to her severe and non-severe impairments of which fibromyalgia was not included.

or pursue treatment." *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11th Cir. 2012). However, an ALJ's failure to consider a claimant's good-cause explanation for not seeking medical treatment does not always constitute reversible error. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). Indeed, reversible error occurs only when the ALJ "primarily if not exclusively" relies on a claimant's failure to seek treatment in determining whether the claimant is disabled. *Id.* Here, the ALJ did not primarily or exclusively rely on McConnell's treatment gap in discounting her symptom testimony. Instead, she also properly relied on the objective medical evidence and McConnell's daily activities. Therefore, even if the ALJ erred by failing to question McConnell regarding the reason for the treatment gap, the error is harmless.

Finally, the ALJ did not err in considering McConnell's daily activities to discount her testimony. The ALJ noted that McConnell could drive two or three times per week, manage her personal care, perform household chores (like mopping, sweeping, and vacuuming) with breaks, attend church regularly, ride a motorcycle (although noting that this occurred outside of the date last insured), and walk. Tr. 22-23. The ALJ found these activities contrasted with McConnell's reports of debilitating pain. While McConnell's daily activities are insufficient, standing alone, to contradict disability, the ALJ may consider them as a factor in her subjective-symptom analysis of McConnell's pain testimony. SSR 16-3p (listing "[d]aily activities" as a factor to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms). As such, the ALJ did not err in relying on McConnell's daily activities, in part, to discount McConnell's

pain testimony. *See Harner v. Saul*, 2021 WL 1208866, at *19 (N.D. Ala. Mar. 31, 2021) (finding that the ALJ properly relied on the claimant's "activities of daily life together with extensive medical evidence").

The undersigned finds that the ALJ considered the appropriate factors and applied the correct legal standards when assessing McConnell's symptom testimony. Therefore, the undersigned concludes that substantial evidence supports the ALJ's discount of McConnell's subjective symptom testimony.

## V.   CONCLUSION

For the reasons set forth above, the decision of the Commissioner is AFFIRMED. A separate judgment will issue.

DONE this 7th day of March, 2022.

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE